USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                               :

CHARLES SEIFE,                   :

                               :

                  Plaintiff,    :

                               :                     1:16-cv-7140-GHW

             -against-          :

                               :         MEMORANDUM OPINION

UNITED STATES DEPARTMENT OF     :            AND ORDER

STATE,                             :

                               :

                 Defendant.    :

                               :

-------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

# I.    INTRODUCTION

Before the Court are cross-motions for summary judgment in this Freedom of Information

Act ("FOIA") dispute between journalist and professor of journalism Charles Seife, appearing *pro se*,

and the United States Department of State (the "State Department") that began with two July 22,

2014 requests for various records related to press briefings given "on background" by anonymous

senior agency officials. The Court must now rule on the adequacy of the State Department's

response to the first request, as well as the applicability of FOIA's Exemptions 5 and 6 to

approximately 80 responsive documents, portions of which were redacted by the State Department,

and to one document withheld in full. For the reasons that follow, the Court concludes that the

State Department is entitled to summary judgment on a portion of its withholdings under

Exemption 6. The Court also concludes that the State Department should be granted a further

opportunity to substantiate its claim that a search in response to the first request would be

unreasonably burdensome, its claims of deliberative process and presidential communications

privilege over the information it has withheld, as well as its claim that Exemption 6 applies to the identities of the anonymous background briefers. The State Department's motion for summary judgment is therefore GRANTED IN PART and DENIED IN PART, and Mr. Seife's motion for summary judgment is DENIED.

## II.     BACKGROUND

On July 22, 2014, Mr. Seife submitted a FOIA request to the State Department seeking information on the following "on background" conferences:

> (1) Background Conference Call by Senior Administration Officials on Iraq, conducted on or about June 20, 2014[;]
> (2) Background briefing by Senior Administration Officials via Conference Call on Afghanistan, conducted on or about May 27, 2014[;]
> (3) Background Briefing on Syria, conducted on or about May 5, 2014[;]
> (4) Background Conference Call on Ukraine Sanctions, conducted on or about April 28, 2014[;]
> (5) Background Briefing on Designation of Boko Haram and Ansaru as Foreign Terrorist Organizations and as Specially Designated Global Terrorists, conducted on or about November 13, 2013[; and]
> (6) Background Briefing on Section 1230 Report on Progress Toward Security and Stability in Afghanistan, Pentagon Briefing Room, conducted on or about December 10, 2012.

Declaration of Eric Stein, ECF No. 29 ("Stein Decl."), Ex. 2. In connection with each of the six on background briefings, Mr. Seife requested (1) the unredacted transcript, which "should identify" the officials involved in the briefing, and (2) any documents, "including but not limited to e-mails, meeting minutes, memos, and other communications," that described the "planning and/or execution of" each briefing. *Id.* That request was received by the State Department and assigned case number F-2014-12996 (the "12996 request"). Stein Decl., Ex. 3.

Also on June 22, 2014, Mr. Seife submitted a second FOIA request to the State Department, seeking the unredacted transcripts for any "on background" briefing that took place between

January 20, 2009 and July 21, 2014.  Stein Decl., Ex. 9.[1]  Mr. Seife explained that "such a transcript should identify officials involved in the conference/briefing/call by name."  *Id.*  That request was assigned case number F-2014-12997 (the "12997 request").  Stein Decl., Ex. 10.[2]

Mr. Seife filed this lawsuit on September 13, 2016, seeking an injunction requiring the State Department to provide him with the requested information.  ECF No. 1.  During a November 22, 2016 initial pretrial conference, the Court directed the State Department to provide a full response to the 12997 request no later than December 16, 2016.  ECF No. 14.  The Court also directed the State Department to provide rolling responses to the 12996 request, with a first production due no later than December 16, 2016, and with production to be completed no later than January 20, 2017.  *Id.*

In accordance with the Court's order, on December 16, 2016, the State Department produced six documents responsive to the 12996 request.  Stein Decl., Ex. 4.  In response to the 12997 request, the State Department explained that it had no responsive documents because the State Department does not maintain transcripts identifying the names of the officials conducting the background briefings.  Stein Decl., Ex. 11.[3]  The State Department also provided the web address at which the background briefing transcripts were available.  *Id.*  The State Department produced additional documents in response to the 12996 request on January 19, 2017.  Stein Decl., Ex. 5.

On March 10, 2017, the Court granted the State Department an extension of time within which to complete its production in response to the 12996 request, extending the January 20, 2017

---

[1] Stein's Declaration indicates that this request is attached as Exhibit 11.  Stein Decl. ¶ 14.  The Court observes that the request is actually attached as Exhibit 9.

[2] Stein's Declaration states that the State Department's letter confirming receipt of the FOIA request and assigning it case number F-2014-12997 is attached to that declaration as Exhibit 12.  Stein Decl. ¶ 15.  However, the letter is actually located at Exhibit 10.

[3] Stein's Declaration indicates that the State Department's December 16, 2016 response to the 12997 request is attached as Exhibit 13.  Stein Decl. ¶ 16.  However, the Court notes that the letter response is actually attached as Exhibit 11.

deadline to April 17, 2017.  ECF No. 18.  Three days before that deadline, on April 14, 2017, the

State Department produced additional responsive documents.  Stein Decl., Ex. 8.  The State

Department also removed certain redactions from previously produced documents and re-released

those documents on January 23, 2017, March 6, 2017, and June 2, 2017.  Stein Decl., Exs. 6, 7, 12.[4]

After receiving a description of the search that the State Department had conducted with

respect to the 12996 request, Mr. Seife requested that additional, targeted searches be performed.

Stein Decl. ¶ 12.  Mr. Seife agreed that, if those searches were conducted, he would not challenge the

adequacy of the Department's search in connection with his 12996 request.  *Id.*  The requested

searches were performed, and the State Department completed its production of documents in

connection with the 12996 request on June 29, 2017.  *Id.* ¶ 13[5]; *see* ECF No. 25.

The State Department withheld information in seventy-two documents under FOIA

Exemption 5, 5 U.S.C. § 552(b)(5), which exempts from disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency."  Stein Decl. ¶ 25.  The State Department claimed that the withheld

information was subject to the deliberative process privilege.  *Id.*  That information related to the

first five background briefings identified by Mr. Seife in his June 22, 2014 request, as well as to a

background briefing on Iraq and Iran that took place on or about June 22, 2014, a background

briefing on a matter related to Afghanistan that was planned for May 31, 2014, and a background

briefing on a presidential speech on Afghanistan that was given on May 28, 2014.  *Id.*  While these

last three briefings were not specifically identified in Mr. Seife's request for information, the State

---

[4] Stein's Declaration states that the June 2, 2017 correspondence from the State Department to Mr. Seife is attached as Exhibit 9.  Stein Decl. ¶ 11.  The Court observes that it is actually attached as Exhibit 12.

[5] Stein's Declaration states that the State Department's June 29, 2017 letter informing Mr. Seife that it had located ten additional responsive documents as a result of the targeted searches is attached to that declaration as Exhibit 10.  Stein Decl. ¶ 13.  The Court observes, however, that the letter is not attached to the declaration, as Exhibit 10 or otherwise.

Department produced the transcripts from each of the briefings after broadly construing Mr. Seife's request for information related to briefings "on or about" the identified dates. *Id.* ¶ 25 n.6. Among the specific material withheld were draft and final talking points, anticipated questions and proposed answers, and e-mail correspondence regarding the content and modalities of the background briefings. *Id.* ¶ 26. The State Department also withheld information under Exemption 5 in one document that it claimed was subject to the presidential communications privilege. *Id.* ¶ 28.

In addition to its withholdings pursuant to Exemption 5, the State Department withheld information in sixty-five responsive documents pursuant to Exemption 6, 5 U.S.C. § 552(b)(6), which permits an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* ¶ 31. That information included the names and official contact information of government employees serving in sensitive positions within the State Department's Bureau of Counterterrorism, the National Security Council, and the Department of Defense, as well as State Department officials' cell phone numbers and the personal email addresses of individuals outside of the government. *Id.* The State Department additionally withheld an official's comment regarding a personal schedule and information that would reveal the identities of the officials who either served as background briefers or were proposed background briefers. *Id.* ¶¶ 31, 32.

In sum, the State Department located ninety-six documents that were responsive to Mr. Seife's 12996 request, of which fifteen were produced in full, eighty were produced with redactions, and one document was withheld in full. *Id.* ¶ 36.[6] Along with its productions, the State Department provided a *Vaughn*[7] index describing the items withheld. *Id.* ¶ 3 n.2.

---

[6] The State Department also withheld information in two documents pursuant to FOIA Exemption 3. Def.'s Mem. in Supp. of Summ. Judgment (ECF No. 28) at 5. Mr. Seife does not challenge those withholdings.

[7] *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).

The parties filed cross-motions for summary judgment. ECF Nos. 27, 30. Following the filing of those motions, the State Department filed a supplemental declaration of Stein, as well as an updated *Vaughn* index. ECF No. 35. The supplemental submissions indicate that, after production of the initial *Vaughn* index, the State Department released portions of previously withheld information. *See* Supplemental Declaration of Eric Stein, ECF No. 35 ("Stein Supp. Decl.") ¶ 8.

In its summary judgment motion, the State Department stands by its withholdings in response to the 12996 request, as identified in the updated *Vaughn* index (the "*Vaughn* index"), and maintains its position that no records responsive to the 12997 request exist. Mr. Seife, in his cross-motion for summary judgment, challenges the State Department's search in connection with the 12997 request and seeks disclosure of a majority of the information withheld pursuant to FOIA Exemptions 5 and 6.

As explained below, the Court holds that the State Department's search in connection with the 12997 request was inadequate. The Court also finds the State Department's submissions insufficient to permit a determination that all of the information withheld under the FOIA exemptions is properly exempt from disclosure.

## III.   LEGAL FRAMEWORK

### A.  Summary Judgment Standard

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved." *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Jones-Edwards v. Appeal Bd. of Nat'l Sec. Agency*, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005)). A moving party is entitled to summary judgment if it can "show[ ] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). A party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). In resolving cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.,* 667 F.2d 305, 314 (2d Cir. 1981)).

Because he is proceeding *pro se*, the Court must liberally construe Mr. Seife's submissions and interpret them "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed' . . . ." (citation omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was

filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013))). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d Cir.2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express,* 766 F.3d 189, 195 (2d Cir.2014); *accord Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

### B. FOIA

"Congress intended FOIA to permit access to official information long shielded unnecessarily from public view." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation and internal quotation marks omitted). "FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Id.* FOIA also contains affirmative disclosure and indexing requirements, which provide that "[e]ach agency . . . shall make available for public inspection in an electronic format . . . final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases . . . those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register . . . [and] administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(2)(A)-(C). "As the Act is structured, virtually every document generated by an agency is available to the public in one form or another, unless it falls within one of the Act's nine exemptions." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 562 U.S. at 565 (internal quotation marks and citations omitted); *see also U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) ("Consistent with the Act's goal of broad disclosure, these exemptions have been

consistently given a narrow compass.").

For an agency to prevail on a summary judgment motion in a FOIA case, it "must demonstrate 'that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'" *Ruotolo v. Dep't of Justice, Tax Div.,* 53 F.3d 4, 9 (2d Cir. 1995) (quoting *Nat'l Cable Television Ass'n v. Fed. Commc'ns Comm'n*, 479 F.2d 183, 186 (D.C. Cir. 1973)). "[T]he defending agency [also] has the burden of showing that its search was adequate." *Carney v. U.S. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir. 1994). "[S]ummary judgment in favor of the FOIA plaintiff" is appropriate "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption," but should be denied if the agency satisfies its burden "to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. U.S. Dep't of Interior,* 976 F.2d 1429, 1433 (D.C. Cir. 1992).

"FOIA specifies that a district court must conduct *de novo* review of an agency's claims to exemptions," *Lee v. Fed. Deposit Ins. Corp.,* 923 F. Supp. 451, 453 (S.D.N.Y. 1996), which "are to be narrowly construed with all doubts resolved in favor of disclosure," *Halpern v. Fed. Bureau of Investigation,* 181 F.3d 279, 287 (2d Cir. 1999). Agency affidavits or declarations "may justify summary judgment" if they are "sufficient to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *Campbell v. U.S. Dep't of Justice,* 164 F.3d 20, 30 (D.C. Cir. 1998) (citation omitted); *see Halpern,* 181 F.3d at 293 ("blind deference is precisely what Congress rejected when it amended FOIA in 1974"). "Affidavits submitted by an agency are 'accorded a presumption of good faith.'" *Carney,* 19 F.3d at 812 (quoting *Safecard Servs., Inc. v. Secs. and Exchange Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

## C. *Vaughn* Submissions

When an agency withholds records in a FOIA case and a complaint challenges such withholding, the district court must "determine the matter *de novo*, and may examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions . . . ." 5 U.S.C. § 552(a)(4)(B). In such a case, "the burden is on the agency to sustain its action." *Id.*

In 1973, in *Vaughn v. Rosen*, the Court of Appeals for the D.C. Circuit held that in order to assure "that allegations of exempt status are adequately justified . . . courts will simply no longer accept conclusory and generalized allegations of exemptions . . . but will require a relatively detailed analysis in manageable segments." 484 F.2d 820, 826 (D.C. Cir. 1973). Thus, when invoking a FOIA exemption, agencies submit a "*Vaughn* index"—a list of withheld documents and claimed exemptions—and a "*Vaughn* affidavit," describing the documents and the agency's rationale for withholding them. Requiring such submissions serves three goals:

> (1) it forces the government to analyze carefully any material withheld, (2) it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, (3) and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

*Halpern*, 181 F.3d at 291 (quoting *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987)). "The titles and descriptions of documents listed in a *Vaughn* index usually facilitate the task of asserting and adjudicating the requester's challenges to the Government's claims of exemption" by "giv[ing] the court and the challenging party a measure of access without exposing the withheld information." *N.Y. Times Co. v. U.S. Dep't of Justice*, 758 F.3d 436, 439 (2d Cir.), *supplemented,* 762 F.3d 233 (2d Cir. 2014).

"Summary judgment is warranted on the basis of [*Vaughn*] affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (internal quotation marks and citations omitted) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). "[W]hat constitutes a 'reasonable' level of specificity [in a *Vaughn* affidavit] varies depending on the particular context," and specifically, which exemption is being invoked. *Halpern*, 181 F.3d at 297 (finding level of specificity insufficient to invoke Exemption 1, but sufficient to invoke Exemption 7(C)). Affidavits submitted by an agency "are accorded a presumption of good faith." *Florez v. Cent. Intelligence Agency*, 829 F.3d 178, 182 (2d Cir. 2016) (quoting *Ctr. for Constitutional Rights v. Cent. Intelligence Agency*, 765 F.3d 161, 166 (2d Cir. 2014)). *Vaughn* submissions are insufficient, however, where "the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

## IV. DISCUSSION

### A. Adequacy of Search in Connection with the 12997 Request

"[T]o establish the adequacy of a search, agency affidavits must be relatively detailed and nonconclusory, and submitted in good faith." *Grand Central P'ship v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (citation and internal quotation marks omitted). "[A]n agency's search need not be perfect, but rather need only be reasonable." *Id.* "[A]gency affidavits must show that the agency made a good faith effort to search for the requested documents, using methods 'reasonably calculated' to produce documents responsive to the FOIA request." *Garcia v. U.S. Dep't of Justice, Office of Info. and Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)); *see Grand Cent. P'ship*, 166 F.3d at 489. Moreover, as noted above, affidavits submitted by an agency are "accorded a presumption of good faith." *Carney*,

19 F.3d at 812.

The State Department argues that its response to the 12997 request was reasonable because it does not maintain "on background" briefing transcripts in the format requested by Mr. Seife, that is, with an inclusion of the name of the government official giving the briefing, and because the transcripts that it does maintain are already publicly available online.  The State Department acknowledges that it did not perform a search for records responsive to the 12997 request, but contends that it was not required to do so because any search was not reasonably calculated to produce responsive results.  Mr. Seife, on the other hand, disputes the reasonableness of the State Department's decision to forego a search, quipping that it is "of note . . . that defendant's non-search took two and a half years to not complete."  Pl.'s Memorandum in Supp. of S.J. and in Opp. to Def.'s Mot. for S.J., ECF No. 33 ("Pl.'s Mem.") at 23 n.9.  Mr. Seife criticizes the State Department's decision primarily because, as he claims, the agency too narrowly construed his request.  Mr. Seife is correct.

The State Department has submitted the affidavit of Eric Stein, who is the Director of the Office of Information Programs and Services ("IPS") of the State Department.  Stein Decl. ¶ 1.  Stein's declaration describes the manner in which FOIA requests are addressed by the State Department and the steps taken by the Department in response to both of Mr. Seife's requests.  Stein's statements related to the 12997 request are detailed, not merely conclusory, and the Court presumes that they are made in good faith.  *See Carney*, 19 F.3d at 812.

Stein's declaration explains that each office within the State Department maintains files concerning foreign policy and other matters that relate to the daily operations of that office.  Stein Decl. ¶ 18.  Those files generally consist of "working copies of documents, information copies of documents maintained in the Central Foreign Policy Records collection, and other documents prepared by or furnished to the office in connection with the performance of its official duties."  *Id.*

12

The offices also maintain electronic copies of documents and emails. *Id.* IPS, which Stein himself currently oversees, is charged with responding to records requests by the public, Congress, other agencies, and those made pursuant to judicial process. *Id.* ¶ 2. IPS is also responsible for records management, privacy protection, national security classification management and declassification review, corporate records archives management, research, operation and management of the State Department's library, and maintenance of the technology applications that support these activities. *Id.*

Stein explains that, when the State Department receives a request for information pursuant to FOIA, IPS evaluates that request and determines which office within the State Department "may reasonably be expected to contain responsive records." *Id.* ¶ 17. That determination is based on the description provided by the requester of the records being sought and requires knowledge of the State Department's records systems, records disposition schedules, and the "substantive and functional mandates" of the offices within the State Department. *Id.*

Stein's declaration goes on to describe the State Department's handling of Mr. Seife's requests. In evaluating the 12997 request, IPS determined that the only State Department component "reasonably likely" to possess responsive documents was the Bureau of Public Affairs ("PA"). Stein Decl. ¶ 19. The Deputy Executive Director of PA, in turn, determined that the only PA component "reasonably likely" to have records responsive to Mr. Seife's request was the Office of Press Relations. *Id.* ¶ 20. The 12997 request was therefore submitted to the director of the Office of Press Relations for review, and that director confirmed that the office did not maintain responsive records. *Id.* ¶ 21.

The Stein Declaration establishes that the State Department "frequently" holds briefings in which government officials address the State Department press corps "on background," that is, "not for individual attribution." Stein Decl. ¶ 22. Stein avers that "[a]ll of these background briefings are

transcribed," but that the transcripts "[a]t no point" identify the background briefers. *Id.* While the government officials hosting the briefings "may" be introduced by name to the journalists, they are identified only as "State Department Official" or "Senior Administration Official" in the transcripts that are produced. *Id.* Therefore, because transcripts of the background briefings never include the name of the briefer, the State Department asserts that it was reasonable for the Office of Press Relations to believe that no search would generate any records responsive to Mr. Seife's request, thereby making any search futile.

The legal premise of this argument is correct: "FOIA does not demand a search that would be futile." *Amnesty Int'l USA v. Cent. Intelligence Agency*, No. 07-cv-5435 (LAP), 2008 WL 2519908, at * 11 (S.D.N.Y. June 19, 2008) (citing *Am.-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F. Supp. 2d 83, 87-88 (D.D.C. 2007)); *see also Thomas v. Comptroller of Currency*, 684 F. Supp. 2d 29, 33 (D.D.C. 2010) (finding agency's decision not to perform a search reasonable where the information requested by the plaintiff was "not the type of information" maintained by the agency); *Am.-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 87-88 (finding the agency's statement that it did not maintain the information sought by the plaintiff was sufficient "if not exactly to show the adequacy of the search, then to explain why a search would be futile and is unnecessary"). However, the State Department's construction of Mr. Seife's request—as pertaining only to transcripts identifying the briefer—is unreasonably narrow.

"To assess the adequacy of a search, courts must first 'ascertain the scope of the request itself.'" *Amnesty Int'l USA*, 2008 WL 2519908, at *12 (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995)). An agency is not "obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). Rather, an agency is "bound to read [a request] as drafted, not as either agency officials or [the requester] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 777

(D.C. Cir. 1984); *see also Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) ("[A]dequacy [of an agency's search] is measured by the reasonableness of the effort *in light of the specific request.*" (emphasis added) (citation omitted)). Nevertheless, an agency may not "read the request so strictly that the requester is denied information the agency well knows exists in its files." *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985). Instead, "an agency has a duty to 'construe a FOIA request liberally.'" *Amnesty Int'l USA*, 2008 WL 2519908, at *12 (quoting *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003)).

Here, the 12997 request seeks, "for any 'on background' conference/briefing/call that took place between January 20, 2009 and July 21, 2014, . . . an unredacted transcript of each conference/briefing/call; such a transcript should identify officials involved in the conference/briefing/call by name." Stein Decl., Ex. 9. The State Department interprets this language as a request for only those transcripts of background briefings that "identify officials involved in the conference/briefing/call by name." Pl.'s Reply Memorandum, ECF No. 38 ("Pl.'s Reply") at 5. However, as Mr. Seife has rightly observed, his request does not limit the transcripts that he seeks to those that *do* identify the briefers by name. Rather, his use of the phrase "should identify" expresses his *expectation* to receive transcripts containing the briefers' identities. Because an agency responding to a FOIA request is mandated to construe the request broadly, the State Department should have interpreted the 12997 request as one for unredacted transcripts of each "on background" conference, briefing, and call that took place between January 20, 2009 and July 21, 2014, regardless of whether the transcript identified by name the government official providing the briefing.

With this liberal construction of the 12997 request in mind, the Court turns to the State Department's decision to forego a search for responsive transcripts. Contrary to the State Department's representation, Mr. Seife argues that the agency does, in fact, maintain transcripts of

background briefings in which the briefers' names are identified. As examples of such transcripts, Mr. Seife points to several transcripts that contain, in place of the briefers' names and titles, bracketed terms such as "title redacted," "introductions redacted," "name deleted," and "briefer name deleted." Pl.'s Mem., Ex. C. These transcripts, Mr. Seife comments, suggest that the State Department "occasionally keeps transcripts" in unredacted form identifying the briefers. Pl.'s Mem. at 23.

In his supplemental declaration, Stein affirms that he reviewed the initial draft of one of the five transcripts relied on by Mr. Seife and confirmed that the draft produced by the stenographer contained the bracketed terms in the first instance, and not the actual names and titles of the briefers. Stein Supp. Decl. ¶ 4. Stein clarified that the briefers' names and titles do not appear in even the initial drafts prepared by the stenographers, but that those drafts are produced with the bracketed terms in place of any identifying information. *Id.* ¶ 5. Mr. Seife has not produced any evidence to suggest that the averments of Stein's supplemental declaration were made in bad faith. Accordingly, the Court affords the supplemental declaration the presumption of good faith that it must and finds that the State Department has adequately shown that any search for unredacted transcripts of background briefings containing the names of the briefers would indeed be futile.

This does not end the inquiry, however, as Mr. Seife's request also included, as the Court has just explained, a request for transcripts in which the briefers' names were *not* identified. It is true that the State Department is not required to produce, in response to a FOIA request, any documents that are otherwise publicly available. *See Triestman v. U.S. Dep't of Justice, Drug Enforcement Admin.*, 878 F. Supp. 667, 671 (S.D.N.Y. 1995) ("[T]o require an agency to collect and produce information that has already been made public would not further the general purpose of FOIA, which is to satisfy the citizens' right to know what their government is up to. . . . FOIA does not obligate an agency to serve as a research service for persons seeking information that is readily

available to the public." (internal quotation marks and citation omitted)). Therefore, to the extent that any responsive transcripts are publicly available online, the State Department is not required to gather and produce those for Mr. Seife.[8]

However, Mr. Seife maintains that other responsive transcripts exist that have not been uploaded to the public website. The State Department does not deny this, and in fact acknowledges that background briefing transcripts prepared by the White House or other federal agencies may have been forwarded to the State Department and to State Department employees and may be stored in the employees' email accounts. Stein Supp. Decl. ¶ 7. Nonetheless, the State Department argues that Mr. Seife's request for transcripts of background briefings over a five-and-a-half-year period is overly broad, and a search for such transcripts would be unreasonably burdensome. Def.'s Opp. to Pl.'s Mot. for S.J. and Reply Memorandum, ECF No. 34 ("Def.'s Reply") at 6 and n.3. While this may in fact be true, the State Department has not sufficiently established the burden that it cites.

For a FOIA request to be proper, the request must "reasonably describe" the records sought. 5 U.S.C. § 552(a)(3)(A). This requirement is satisfied "if a professional employee of the agency familiar with the subject matter can locate the records with a reasonable amount of effort." *Freedom Watch, Inc. v. Cent. Intelligence Agency,* No. 12-cv-0721 (ESH), 2012 WL 4753281, at *6 (D.D.C. Oct. 5, 2012) (internal citations and quotation marks omitted). Mr. Seife's request for unredacted transcripts of "on background" briefings, conferences, and calls between January 20, 2009 and July 21, 2014 reasonably describes the records sought. Mr. Seife provides the State Department with the specific form of document that he seeks—transcripts—along with the applicable date range for his request. This is unlike requests that courts have found to be overly broad. *See, e.g.*, *Roman v. Cent.*

---

[8] Indeed, Mr. Seife has acknowledged that he does not seek duplications of the publicly available transcripts. Pl.'s Mem. at 24 n.10.

*Intelligence Agency*, No. 11-cv-5944 (JFB) (WDW), 2013 WL 210224, at *6 (E.D.N.Y. Jan. 18, 2013) (finding that a request for "all files and/or reports" on "Arch of the Covenant" and "military or non-military reports of angels and persons dressed in white" was "not specific enough for an employee of the agency to find all files regarding this information with a 'reasonable amount of effort'"); *Dale v. Internal Revenue Serv.*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (finding that a request for "any and all documents, including but not limited to files, that refer or relate in any way to Billy Ray Dale" was overly broad); *Mason v. Callaway*, 554 F.2d 129, 131 (4th Cir. 1977) (concluding that a request for "all correspondence, documents, memoranda, tape recordings, notes, and any other material pertaining to the atrocities committed against plaintiffs, . . . including, but not limited to, the files of [various government offices] . . . typifies the lack of specificity that Congress sought to preclude in the requirement of 5 U.S.C. § 552(a)(3) that records sought be reasonably described").

Moreover, to the extent that the State Department determined that the request did not reasonably describe the records being sought, it was under the obligation to engage in a dialogue with Mr. Seife to more appropriately tailor the request, a process that the State Department undertook in connection with the 12996 request. *See Ruotolo*, 53 F.3d at 10 (holding that under 28 C.F.R. § 16.3(b), the agency had a duty to assist FOIA requesters "in reformulating their request if it was thought that the request needed to be narrowed"). It is not apparent that the State Department engaged in a similar process with respect to the 12997 request.

Furthermore, while Stein affirms in his supplemental declaration that a search for transcripts of background briefings not uploaded to the State Department's website would be "incredibly burdensome," Stein Supp. Decl. ¶ 7, he fails to sufficiently explain how and why it would be so. "An agency need not respond to a request that is 'so broad as to impose an unreasonable burden upon the agency,' such as one which 'require[s] the agency to locate, review, redact, and arrange for inspection a vast quantity of material.'" *Nat'l Day Laborer Organizing Network v. U.S. Immigration and*

*Customs Enf't*, No. 16-cv-387 (KBF), 2017 WL 1494513, at *11 (S.D.N.Y. Apr. 19, 2017) (quoting

*Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282, 290-91 (D. Conn. 2012), *aff'd*, 570

F. App'x 54, 57 (2d Cir. 2014)); *accord Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*,

907 F.2d 203, 209 (D.C. Cir. 1990); *Roman*, 2013 WL 210224, at *6. "The rationale for this rule is

that FOIA was not intended to reduce government agencies to full-time investigators on behalf of

requestors." *Freedom Watch, Inc.,* 2012 WL 4753281, at *6. Nonetheless, if an agency claims that

responding to a request is unreasonable, "it bears the burden to 'provide [a] sufficient explanation as

to why such a search would be unreasonably burdensome.'" *Ayuda, Inc. v. Fed. Trade Comm.*, 70 F.

Supp. 3d 247, 275 (D.D.C. 2014) (alteration in original) (quoting *Nation Magazine*, 71 F.3d at 892).

The State Department's explanation of the burden involved here is inadequate.

Stein attests that "there is no centralized or systematized process by which [other federal]

entities send transcripts to PA" and that a search for transcripts of background briefings would

"need to cover the individual e-mail accounts of all employees who may have signed up to receive

press releases from the White House or other agencies." Stein Supp. Decl. ¶ 7. That is the extent of

his explanation of the burden imposed by Mr. Seife's 12997 request. Stein provides no information

regarding the total number of email accounts that would need to be searched, or the level of

difficulty of, or amount of time required by, the search process itself. Absent such or similar

information describing with reasonable specificity the actual burden imposed by the 12997 request,

the Court cannot conclude that a response to Mr. Seife's request would in fact be unduly

burdensome. [9]

---

[9] Under the State Department's interpretation of the 12997 request, it was reasonable for the agency to believe that the Office of Press Relations would be the most likely to possess responsive records. First, Stein's declaration sufficiently establishes that IPS had the knowledge required to determine which office within the State Department was reasonably likely to maintain records responsive to the request. IPS itself is tasked with managing records within the State Department and with responding to records requests under FOIA. Stein Decl. ¶ 2. Second, the Stein Declaration sufficiently shows that the Office of Press Relations was reasonably likely to have the requested records. As Stein explains in his declaration, the Office of Press Relations is "the central conduit of information flowing from the [State] Department to accredited journalists" and "supports the President and the Secretary of State by explaining U.S. foreign

### B. The 12996 Request

#### 1. Documents Withheld Pursuant to Exemption 5

The State Department claims that portions of various emails, draft talking points, proposed questions and answers, and draft documents in connection with press releases are properly withheld under Exemption 5. Mr. Seife argues that the State Department has failed to carry its burden to show that the redacted information in these documents is subject to either the deliberative process privilege or the presidential communications privilege. The Court agrees with Mr. Seife.

FOIA Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5); *see also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) ("Exemption 5 of the FOIA . . . provides that the affirmative disclosure provisions do not apply to 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." (citing 5 U.S.C. § 552(b)(5))). "Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the. . . deliberative process . . . privilege[ ]." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005); *see also Sears,* 421 U.S. at 149 ("[I]t is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context."); *Grand Cent. P'ship*, 166 F.3d at 481 ("Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under

---

policy and actions to domestic and foreign journalists." *Id.* ¶ 20. The office prepares the State Department spokesperson for daily press briefings, releases additional information to the media, acts as the "authoritative channel of information about the Secretary's schedule," and responds to inquiries from the press. *Id.* In light of these functions performed by the Office of Press Relations, it was reasonable to believe that that office would have in its possession any documents responsive to the 12997 request. Because the Court finds that the State Department's interpretation of the 12997 request was overly narrow, and in light of the State Department's recognition that Department employees may have responsive documents stored in their email, it is not clear that the Office of Press Relations would be the only department to have information responsive to the 12997 request as the Court has just interpreted that request.

Exemption 5." (citations and internal quotation marks omitted)).

A document fitting the criteria for withholding under Exemption 5 may nevertheless fall outside of Exemption 5 "if it closely resembles that which FOIA affirmatively requires to be disclosed: 'final opinions . . . made in the adjudication of cases,' 'statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,' and 'administrative staff manuals and instructions to staff that affect a member of the public.'" *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 195 (2d Cir. 2012) (quoting 5 U.S.C. § 552(a)(2)(A)-(C)). The two long-recognized exceptions to Exemption 5 are: (1) adoption, *i.e.*, "when the contents of the document have been adopted, formally or informally, as the agency position on an issue or are used by the agency in its dealings with the public"; and (2) working law, *i.e.,* "when the document is more properly characterized as an opinion or interpretation which embodies the agency's effective law and policy." *Id.* (internal citations and alterations omitted); *see also Sears*, 421 U.S. at 153 ("The affirmative portion of the Act, expressly requiring indexing of 'final opinions,' 'statements of policy and interpretations which have been adopted by the agency,' and 'instructions to staff that affect a member of the public,' 5 U.S.C. § 552(a)(2), represents a strong congressional aversion to secret (agency) law and represents an affirmative congressional purpose to require disclosure of documents which have the force and effect of law." (internal citation and quotation marks omitted)).

### a. Deliberative Process Privilege

Exemption 5 encompasses the deliberative process privilege, a privilege that protects records that are: "(1) predecisional, *i.e.,* prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.,* actually related to the process by which policies are formulated." *La Raza*, 411 F.3d at 356 (internal quotation marks omitted) (quoting *Grand Cent. P'Ship*, 166 F.3d at 482). This privilege protects "recommendations, draft documents, proposals, suggestions, and other

subjective documents which reflect the personal opinions of the writer rather than the policy of the agency," as well as "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Grand Cent. P'Ship*, 166 F.3d at 482 (citation omitted).

A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Grand Cent. P'Ship*, 166 F.3d at 482; *accord Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002); *Hopkins v. U.S. Dep't of Housing & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991). In assessing whether a document is predecisional, courts also consider whether the government can: "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Nat'l Congress for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000) (quotations and citation omitted).

A document is "deliberative" if it is "actually . . . related to the process by which policies are formulated." *Stinson v. City of New York*, 304 F.R.D. 432, 435 (S.D.N.Y. 2015) (omission in original) (quoting *Sec. & Exchange Comm'n v. Collins & Aikman Corp.*, 256 F.R.D. 403, 416 (S.D.N.Y. 2009)). "The privilege 'does not operate indiscriminately to shield all decision-making by public officials' such as 'routine operating decision[s].'" *N.Y. Times Co.*, 499 F. Supp. 2d at 514 (quoting *Schiller v. City of New York*, 04-cv-7922 (KMK) (JCF), 2007 WL 136149, at *12 (S.D.N.Y. Jan. 19, 2007)). "To determine whether a document is deliberative, '[c]ourts have looked to factors such as whether the document "(i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" *Id.* (quoting *Grand Cent. P'Ship*, 166 F.3d at 482).

The deliberative process privilege "does not, however, as a general matter, cover 'purely factual' material." *Hopkins*, 929 F.2d at 85. Nor does the privilege "protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Tigue*, 312 F.3d at 80 (quoting *Grand Cent. P'Ship*, 166 F.3d at 482).

Most of the documents at issue in this case involve deliberations regarding the scheduling of various press events and the substance of the message to be communicated to the press during those events. The parties' briefing underscores a split among district courts, in the absence of binding appellate precedent, as to whether an agency's decision regarding when, what, and how to communicate to the press is in itself the type of policy-oriented judgment that is protected by the deliberative process privilege. The Courts of Appeals for the Second and District of Columbia Circuits have yet to establish a clear rule on the matter. Other courts in this district have answered the question in the negative, holding that "[d]eliberations about how to present an already decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public, including in draft form, are at the heart of what should be released under FOIA." *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011); *see id.* (concluding that agency deliberations about the "messaging" to be delivered to the public about an existing policy is not protected under the privilege); *MacNamara v. City of New York*, No. 04-cv-9216 (KMK) (JCF), 2007 WL 1169204, at *5 (S.D.N.Y. Apr. 20, 2007) ("Whether or not the Mayor should use . . . suggested 'talking points' is not the sort of public policy decision that falls within the scope of the [deliberative process] privilege."); *Fox News Network, LLC v. U.S. Dep't of Treasury ("Fox News II")*, 911 F. Supp. 2d 261, 276 (S.D.N.Y. 2012) ("[C]ommunications concerning how to present agency policies to the press or public, although deliberative, typically do not qualify as substantive policy decisions protected by the deliberative process privilege.").

It is only when a draft public statement would reveal the agency's deliberations regarding the underlying substantive policy that these courts find that the privilege applies. *See Citizens Union of City of N.Y. v. Attorney Gen. of N.Y.*, 269 F. Supp. 3d 124, 165 (S.D.N.Y. 2017) (recognizing that "discussions about, and revisions to, a draft public statement may be privileged if disclosure of the communications would reveal how the Legislature's or Governor's deliberations regarding the underlying ethics reform legislation progressed over time"); *Fox News Network, LLC v. U.S. Dep't of Treasury ("Fox News I")*, 739 F. Supp. 2d 515, 545 (S.D.N.Y. 2010) (holding that a draft press release about a non-final policy decision, along with emails about the press release, were privileged because they revealed alternatives that were ultimately not adopted and discussed rationales that may not accurately reflect the ultimate rationale for the policy decision).

On the other hand, courts in the District of the District of Columbia have concluded that draft talking points, anticipated questions and proposed answers, and other documents reflecting deliberations about how to present an agency's policy to the public are entitled to the protection of the deliberative process privilege. *See, e.g.*, *ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 136 (D.D.C. 2008) (finding that emails containing agency employees' opinions on public relations were subject to the deliberative process privilege); *Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 19 (D.D.C. 2004) (concluding that the agency sufficiently showed that a document containing draft talking points was protected by the deliberative process privilege when those talking points were "predecisional to the actual communication of [the] information and issues"); *Thompson v. Dep't of the Navy*, No. CIV. A. 95-347 (RMU), 1997 WL 527344, at *4-5 (D.C.C. Aug. 18, 1997) (finding that a set of hypothetical questions to help an admiral prepare for an interview, a critique of a practice interview, a draft answer to a possible media question, and a video of a mock press conference were privileged because the materials showed the Navy's "predecisional, deliberative process concerning what information it was going to disclose to the media"). The First Circuit

Court of Appeals has more recently followed this approach as well, determining that "documents [that] deal with the [agency's] decision of how and what to communicate to the public" are predecisional because that decision "is a decision in and of itself." *New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 54 (1st Cir.), *cert. denied*, 136 S. Ct. 383 (2015).

As Judge Maas aptly remarked, "[i]n light of these conflicting decisions, it is appropriate to focus on the policy underlying the deliberative process privilege." *Fox News I*, 739 F. Supp. 2d at 544. As the Supreme Court has explained, the deliberative process privilege rests on "the policy of protecting the 'decision making processes of government agencies,'" with a particular focus on "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions are policies are formulated.'" *Sears*, 421 U.S. at 150 (internal citations omitted). "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Id.* at 151. As then-Judge Ginsburg highlighted, "[i]n enacting Exemption 5, Congress determined that the 'efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to "operate in a fishbowl."'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)).

It is established that a document is predecisional, and potentially subject to the deliberative process privilege's protections, where that document is "prepared in order to assist an agency decisionmaker in arriving at his *decision*." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975) (emphasis added); *accord Grand Cent. P'Ship*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84. Of course, not every decision made by an agency is shielded by the deliberative process privilege. *See N.Y. Times Co.*, 499 F. Supp. 2d at 514. Nonetheless, underlying the deliberative process privilege is the recognition that "the process of selecting among alternative policies can be delicate and audience-sensitive, susceptible to distortions and vulnerable to fudging when the deliberators

fear or expect public reaction." *Petroleum Info. Corp.*, 976 F.2d at 1435. This consideration provides considerable weight to the approach embraced by the District of the District of Columbia: an agency's decision regarding how to present its substantive policies to the public often involves the evaluation of alternative public relations policies, policies which by their very nature are audience-sensitive and must anticipate public reaction. Even when an underlying decision or policy has already been established by the agency, the decision of how, and to what extent, to convey that policy to the public may require input by many working components within the agency, or even an analysis of the underlying policy itself. The Court is concerned that a rule categorically exempting such decisions from the deliberative process privilege would force agencies to prematurely "operate in a fishbowl." *Id.* at 1434.

Moreover, the Second Circuit has previewed its position on this issue, a position which aligns with the approach taken by the First Circuit and the District of the District of Columbia. In *American Civil Liberties Union v. Department of Justice*, the Second Circuit found that the deliberative process privilege applied to "a draft of a proposed op-ed article that suggested some *ways of explaining* the Government's legal reasoning in support of drone strikes." 844 F.3d 126, 133 (2d Cir. 2016) (emphasis added). The article was never published, and the Circuit concluded that, "[a]lthough it reveals some of the unnamed writer's thinking about legal justification for drone strikes, it is a draft and for that reason predecisional." *Id.* The draft document is not described as reflecting deliberations in connection with the underlying drone strike policy, but rather in connection with the ways in which the administration's justification for those strikes would be presented to the public. If the Second Circuit viewed such a decision as outside the category of policy-oriented judgment protected by the deliberative process privilege, there would be no basis for the Circuit's conclusion that the document was in fact privileged. Thus, while *American Civil Liberties Union* contains no detailed analysis in connection with the privilege's application to that draft document, it does suggest

that, if faced with the question of whether decisions regarding press strategy may be exempt from disclosure under the deliberative process privilege, the Second Circuit's answer would be "yes."

In light of *American Civil Liberties Union*, the First Circuit's holding, and the policy underpinnings of the deliberative process privilege, this Court respectfully parts ways with its esteemed colleagues and adopts the approach espoused by the District of the District of Columbia. Therefore, the State Department here may withhold documents that reflect agency deliberations regarding the manner in which its policies are explained to the public. Nonetheless, the burden remains on the State Department to "furnish the Court with specific information establishing that the [document] is both predecisional and deliberative, by explaining, for example, the 'function and significance [of the document] in the agency's decisionmaking process.'" *Fox News II*, 911 F. Supp. 2d at 276 (quoting *N.Y. Times Co.*, 499 F. Supp. 2d at 515); *see also Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 741 (a draft document is only protected by the privilege "if it contains discussions that reflect the policy-making process"); *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (emphasizing the need for detailed submissions by the agency showing that the documents reflect the "give-and-take of the consultative process" as well as "the role played by the documents in issue in the course of that process" (internal citations omitted)).

Here, the documents withheld by the State Department pursuant to the deliberative process privilege are described in the Stein Declaration and *Vaughn* index as intra- and inter-agency email exchanges regarding the content and modalities of various "on background" briefings, as well as related draft and final talking points, anticipated questions and proposed answers, draft "rollout" schedules, and draft opening statements.

### i. Emails

The documents listed in Categories 1, 3, 4, 6, 12, 19 through 22, and 25 through 29 are various email exchanges that discuss internal State Department deliberations and consultations with

other agencies regarding the text of, timing of, and participation in various State Department background briefings and other announcements. Those include the November 13, 2013, announcement designating Boko Haram and Ansaru as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the agency's May 5, 2014 background briefing on Syria, travel and press schedules related to issues concerning Afghanistan, a May 2014 background briefing on the topic of Sergeant Bowe Bergdahl's release and return, background briefings on Iraq and Iran, and the public rollout of a policy announcement on Ukraine-related sanctions. The Stein Declaration explains in general terms that the State Department "often uses background briefings to provide the public with additional information about important policy announcements or evolving policy actions" and that background briefings are "frequently" scheduled "either immediately before or immediately following policy announcements or decisions." Stein Decl. ¶ 26. Stein goes on to state that deliberations regarding the manner in which the background briefings will be executed "often take place in the context of broader discussions of accompanying public outreach strategies and the underlying policy actions at issue," *id.*, and "involve foreign policy considerations the disclosure of which could chill the free flow of internal recommendations, candid assessments and necessary exchanges in which government officials are involved," Stein Supp. Decl. ¶ 11.

The *Vaughn* index provides slightly more detail regarding the nature of the alleged deliberations reflected in the redacted documents. It explains that the materials in Categories 1, 3, 4, and 26 relate to a final decision regarding the text and timing of, and participation in, certain announcements and the potential participants in the related background briefings. Stein Supp. Decl., Ex. 19 at 1-4, 22. Some of these emails are additionally described as reflecting foreign policy considerations. *See id.* at 2-3, 22. The emails listed in Categories 6, 12, 21, and 29 include proposed talking points and anticipated questions and proposed answers in connection with background briefings. *Id.* at 6, 11, 18, 25. The emails in Category 12 also include discussions regarding the

individual to serve as background briefer and "deliberations about a response to a senator's Question for the Record," which the State Department asserts is not responsive to Mr. Seife's request. *Id.* at 11. The emails in Category 19 reference deliberations with respect to the content of a statement to be made by Secretary of State John Kerry and the "sequencing of events surrounding the statement." *Id.* at 16. The email in Category 20 discusses the selection of a background briefer, content of talking points, and communications to the briefing attendees.[10] *Id.* at 17. The emails listed in Categories 22, 25, and 28 include discussions regarding schedules of possible press events and the appropriate participants. *Id.* at 19, 21, 23. The authors of all of the withheld emails are identified only as State Department or other agency "officials," and any relationship between the authors and recipients is not apparent from the submissions. Finally, the *Vaughn* index states that some of the withheld emails reflect their authors' views and opinions, but provides no such information in connection with the emails listed in Categories 1, 3, 4, 26, and 29.

The information submitted in the *Vaughn* index and the Stein Declaration is insufficient to allow the Court to determine whether a majority of the information withheld on the basis of the deliberative process privilege are in fact entitled to such protection. The *Vaughn* index states that many of these emails contain "deliberations" and "internal Department discussions" regarding "press strategy" and the "text, timing, and participation in" the State Department's announcements. However, it is unclear that all of the emails are predecisional and deliberative. *See* Stein Supp. Decl., Ex. 19 at 1-4, 16, 19, 21-23. While several of the emails appear to temporally pre-date the State Department announcements and background briefings that they relate to, some of the emails are dated the same date as the announcement to which they relate. This is particularly true of many emails related to the State Department's November 13, 2013 announcement regarding Boko Haram

---

[10] This email is also described as including communications with presidential advisers, and the State Department has withheld it under the presidential communications privilege, discussed *infra* at Section IV.B.1.b

and Ansaru, as well as the emails in Category 19, all of which are dated the same date as the related background briefing. *See id.* at 1, 3-5. Other emails, such as the emails in Categories 6, 20, 21, and 22, relate to events for which a date is not provided. *See id.* at 6, 17-19.

Even if the emails could all be considered predecisional, the Court cannot conclude that they are deliberative. Despite the conclusory assertion that the emails reflect the State Department's deliberations, the emails' roles in the deliberative process are not apparent from the State Department's submissions. *See Quinon*, 86 F.3d at 1227 (noting that *Vaughn* submissions are insufficient where "the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping"). There is no indication in the Stein Declaration or the *Vaughn* index, for example, that the emails concerning the text, timing, and modalities of certain agency announcements include recommendations or proposals, or that they reflect the views of the authors rather than of the agency. *Cf. Sierra Club*, 384 F. Supp. 2d at 19 (finding that an emailed document was protected by the deliberative process privilege when it "specified the decision at issue . . . and that the document contained recommendations, which may or may not have been adopted"); *see Grand Cent. P'Ship*, 166 F.3d at 482 (explaining that the deliberative process privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency").

Nor does the *Vaughn* index identify the authors and recipients of the emails with sufficient specificity to determine that the emails do not contain "the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports*, 926 F.2d at 1195; *see id.* (recognizing that "the relation between the author and recipients of the document" is a "key feature under both the 'predecisional' and 'deliberative' criteria"). The relationships between the authors and recipients of these emails are particularly important in light of the fact that the dates of many of the emails allegedly reflecting the deliberative process—and not the State Department's final decisions

regarding its press strategy—coincide with the dates of the announcements to which they relate, and the *Vaughn* index does not state that all of those emails contain the authors', rather than the agency's, opinions. Absent information describing the authors and recipients, or whether the communications involved recommendations for consideration in the deliberative process, such as suggestions made by junior officials to senior officials or decision-makers within the agency, the Court cannot determine that the emails are deliberative in nature and subject to the privilege. *See Access Reports*, 926 F.2d at 1195 ("A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take."); *U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp.*, 222 F. Supp. 3d 38, 42 (D.D.C. 2016) ("Even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted formally or informally, as the agency position on an issue." (citation omitted)).

Additionally, certain emails, such as those contained in Categories 25, 26, and 28, are described as including information regarding the planning of several press events. Yet, the State Department has not shown that those communications are press *policy* discussions, such as those that have been protected by the District of the District of Columbia, rather than mere logistical or "routine operating decision[s]." *N.Y. Times Co.*, 499 F. Supp. 2d at 514; *see ICM Registry*, 538 F. Supp. 2d at 136 ("[D]eliberations regarding public relations *policy* are deliberations about policy, even if they involve 'massaging' the agency's public image." (emphasis added)). Stein's supplemental declaration states generally that discussions regarding the planning of press events involves foreign policy considerations, but does not explain how those foreign policy considerations elevate the event-planning discussions from routine operating decisions to policy-oriented deliberations.

Overall, the emails listed in the Vaughn index and the descriptions provided by the State

Department are simply insufficient for the Court to determine the role that these emails and their contents played in the agency's deliberations.

### ii. Proposed Talking Points, Anticipated Questions and Proposed Answers, and Draft Opening Statements

"The mere fact that a document is a draft . . . is not a sufficient reason to automatically exempt it from disclosure." *N.Y. Times Co.*, 499 F. Supp. 2d at 515 (quoting *Lee,* 923 F. Supp. at 458). The descriptions provided by the State Department of many of the "proposed" talking points and anticipated questions and proposed answers do not include specific information about the documents, such as the dates on which they were prepared, the relationship between their author and ultimate recipient, or their "function and significance in the agency's decisionmaking process." *The Wilderness Soc'y v. U.S. Dep't of the Interior,* 344 F. Supp. 2d 1, 14 (D.D.C. 2004).

It is equally unclear whether the "proposed" talking points that were withheld were in draft or final form. Stein's declaration states that the withheld documents include "draft and final proposed talking points." Stein Decl. ¶ 26. However, the descriptions provided in the *Vaughn* index do not specify whether the proposed talking points at issue are in draft or final form, or whether they were the talking points actually implemented by State Department officials in communicating with the press. *See Brennan Ctr.*, 697 F.3d at 195 (noting that documents may lose Exemption 5 protection if they are "used by the agency in its dealings with the public").

Moreover, with the exception of the document in Category 15, these documents were withheld only part, yet the *Vaughn* index does not specify the information that was withheld. Instead, the index explains in conclusory terms that the documents were withheld in part under Exemption 5 as they contain material "which is pre-decisional and deliberative with respect to a final decision" on "points made to the press" or "press guidance," and that the documents contain "the authors' thoughts and opinions." Stein Supp. Decl., Ex. 19 at 5, 6, 9, 10, 14, 15. First, as previously explained, conclusory explanations are insufficient to justify application of the deliberative process

privilege. *See Quinon*, 86 F.3d at 1227. More fundamentally, the Court simply cannot determine whether material is appropriately withheld without a more fulsome description of what that material is.

With respect to the draft listed in Category 15, which was withheld in whole, the *Vaughn* index describes this document as "anticipated questions and proposed answers regarding the Department's November 13, 2013 announcement designating Boko Haram and Ansaru as Foreign Terrorist Organizations and Specially Designated Global Terrorists." Stein Supp. Decl., Ex. 19 at 13. No additional details are provided. The date of the document is unknown, as are the roles played by the author and recipient and the document itself in any related decisionmaking process.

The drafts of opening statements contained in Category 13 are likewise inadequately described. While the State Department indicates that the two documents in that category are a clean draft and a subsequent redline draft of opening statements "prepared for the Department's November 13, 2013 background briefing about the designation of Boko Haram and Ansaru" as terrorist organizations, the *Vaughn* index does not specify what portions of those drafts were withheld. *See* Stein Supp. Decl., Ex. 19 at 12.

Based upon the information provided by the State Department, the Court cannot determine that the proposed talking points, draft questions and answers, and draft opening statements "formed an essential link in a specified consultative process" or "if released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'Ship*, 166 F.3d at 482.

### iii. Draft Rollout Schedules

The State Department has withheld portions of draft "rollout" schedules related to the announcement designating Boko Haram and Ansaru as terrorist organizations and to "the topic of Iraq." Stein Supp. Decl., Ex. 19 at 10, 14. The former, listed in Category 11, does not specify which

portions of the draft document were withheld. *See id.* at 10. The withheld information in the latter, listed in Category 17, is described as proposed events, proposed participants, and tentative timing of events. *Id.* at 14. From the conclusory statements offered to explain the application of Exemption 5, the Court cannot determine whether this information is properly subject to the deliberative process privilege, or falls instead in the category of "routine operating decision[s]." *N.Y. Times Co.*, 499 F. Supp. 2d at 514.

### b. Presidential Communications Privilege

The presidential communications privilege is "closely affiliated" with the deliberative process privilege. *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997); *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) ("Exemption 5 also has been construed to incorporate the presidential communications privilege."). "The privilege protects 'communications in performance of a President's responsibilities, . . . of his office, . . . and made in the process of shaping policies and making decisions.'" *Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13-cv-9198 (KMW) (JCF), 2017 WL 1155910, at *9 (S.D.N.Y. Mar. 27, 2017) (alterations in original) (quoting *Amnesty Int'l USA v. Cent. Intelligence Agency*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010)). The privilege "applies to communications made in the process of arriving at presidential decisions." *N.Y. Times Co.*, 499 F. Supp. 2d at 516 (quoting *In re Sealed Case*, 121 F.3d at 745). The privilege protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'" *Amnesty Int'l*, 728 F. Supp. 2d at 522 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)).

Broader than the deliberative process privilege, the presidential communications privilege protects "final and post-decisional materials as well as pre-deliberative ones." *Amnesty Int'l*, 728 F. Supp. 2d at 522 (quoting *In re Sealed Case*, 121 F.3d at 745). The privilege extends beyond direct communications by the President to communications "solicited and received" by senior presidential

advisors, as well as communications authored by such advisors themselves. *In re Sealed Case*, 121 F.3d at 752. The privilege additionally protects records memorializing or reflecting such communications. *Amnesty Int'l*, 728 F. Supp. 2d at 522; *Citizens for Responsibility & Ethics ("CREW") v. U.S. Dep't of Homeland Sec.*, No. 06-cv-0173 (RJL), 2008 WL 2872183, at *3 (D.D.C. July 22, 2008).

The State Department has withheld one document that it claims is exempt from disclosure pursuant to the presidential communications privilege—an email listed in Category 20 of the *Vaughn* index. That email is described as "an inter-agency email exchange containing deliberations about the preparation of talking points, proposed answers to anticipated questions, and the selection of Department and [Department of Defense] briefers for an upcoming background briefing that concerned Iraq." Stein Supp. Decl., Ex. 19 at 17. The *Vaughn* index explains that portions of this email were withheld under the presidential communications privilege because the withheld material includes a communication sent by Bernadette Meehan, a director of strategic communications at the National Security Council, on June 19, 2014. *Id.* Stein's declaration describes Ms. Meehan as a "senior presidential advisor with broad and significant responsibility for gathering information in the course of preparing advice for potential presentation to the President." Stein Decl. ¶ 28. The supplemental declaration states that Ms. Meehan was responsible for advising the President on "strategic communications on matters related to national security, including the United States policy towards Iraq." Stein Supp. Decl. ¶ 9. Stein also avers that disclosure of the withheld information in the email exchange would reveal both information regarding the process by which the President receives national security advice from his advisers, as well as information about the advice itself. *Id.*

Mr. Seife contests the factual premise of these statements, arguing that spokespeople generally do not advise the President on subjects such as foreign policy or national security, and that it is unlikely that Ms. Meehan would advise the President on press strategy, as that role is usually relegated to the White House Office of Communications. Pl.'s Mem. at 11. He correctly argues that

the presidential communications privilege is to be applied only to those communications that are authored or received in the course of advising the President. *See In re Sealed Case*, 121 F.3d at 752 ("Of course, the privilege only applies to communications that [ ] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters."); *accord Judicial Watch*, 365 F.3d at 1116; *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 23 (D.D.C. 2013). Indeed, when a presidential adviser is simultaneously responsible for performing functions other than advising the President, "the government bears the burden of proving that the communications occurred in conjunction with the process of advising the President." *In re Sealed Case*, 121 F.3d at 752.

Here, the Court accepts the factual premise established by the State Department, namely that Ms. Meehan was a senior presidential adviser. *See Florez*, 829 F.3d at 182 (noting that affidavits submitted by an agency are accorded a "presumption of good faith"). Despite Mr. Seife's protestations, the Court does not discern any suggestion of bad faith on the part of the State Department. Nevertheless, Mr. Seife is correct in that the agency has not carried its burden of providing the Court with sufficient detail for it to determine that the email in question was authored in the course of advising the President. Neither Stein's declarations nor the *Vaughn* index indicate that the information in the email was gathered or created for the purpose of advising the President, or in the course of such advising. Particularly because Ms. Meehan is a "dual hat" adviser, the State Department must show that this email was prepared in the course of advising the President, and not in the performance of some other governmental function. *In re Sealed Case*, 121 F.3d at 752.

## 2. Documents Withheld Pursuant to Exemption 6

The State Department withheld various categories of information claiming that Exemption 6 applies. The withheld information includes agency officials' official government email addresses, cell phone numbers, the identities of background briefers, and names of certain agency officials. The

State Department also withheld contact information for members of the public and an official's comments about personal plans. Mr. Seife does not take issue with all of these withholdings. Rather, he contests the redaction of the background briefers' identities, the names of Department of Defense ("DoD") officials, and government email addresses and cell phone numbers of agency officials.

FOIA Exemption 6 exempts from disclosure information from personnel, medical, or other similar files that "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exemption "is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Wood v. Fed. Bureau of Investigation*, 432 F.3d 78, 86 (2d Cir. 2005) (Sotomayor, J.) (quoting *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)). Exemption 6 is "specifically aimed at protecting the privacy of personal information in government records." *Associated Press v. U.S. Dep't of Justice*, No. 06-cv-1758 (LAP), 2007 WL 737476, at *4 (S.D.N.Y. Mar. 7, 2007), *aff'd*, 549 F.3d 62 (2d Cir. 2008).

A court's inquiry regarding the applicability of Exemption 6 to withheld information is a two-step process. *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 174 (2d Cir. 2014); *Wood*, 432 F.3d at 86. First, the court "must determine whether the personal information is contained in a file similar to a medical or personnel file." *Wood*, 432 F.3d at 86. If the information is contained in a "similar file," the court must then "balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the [information] would constitute a 'clearly unwarranted invasion of personal privacy.'" *Id.* (quoting 5 U.S.C. § 552(b)(6)) (citing *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991)).

### a. "Similar Files"

A majority of the withheld personal information is contained in emails. The State Department has also withheld the names of background briefers appearing in proposed talking

points, draft opening statements, and a draft rollout schedule, as well as an agency official's cell phone number contained in draft opening statements. These documents are "similar files" under FOIA.

"The phrase 'similar files' sweeps broadly and has been interpreted by the Supreme Court to mean 'detailed Government records on an individual which can be identified as applying to that individual.'" *Cook*, 758 F.3d at 174 (quoting *Washington Post*, 456 U.S. at 602); *accord Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009). As the Supreme Court has further explained, "the protection of an individual's right of privacy, which Congress sought to achieve by preventing the disclosure of [information] which might harm the individual, surely was not intended to turn upon the label of the file which contains the damaging information." *Washington Post*, 456 U.S. at 601 (alteration in original). Therefore, "a record need not be like a personnel file in the sense that it is employment-related or a medical file in the sense that it contains a record of a person's medical history or medical treatment and care." *Cook*, 758 F.3d at 174. "Indeed, the record need not even be a 'file.'" *Id.*; *accord N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006-07 (D.C. Cir. 1990). Nor does the information in the file need to be "intimate"; "the threshold for determining whether information applies to a particular individual is minimal." *Milton v. U.S. Dep't of Justice*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co.*, 920 F.2d at 1006).

The emails at issue here are "similar files" under Exemption 6. They contain the names and email addresses of agency officials, and, thus, can be identified as applying to those individuals. *See Cook*, 758 F.3d at 174; *see also Judicial Watch, Inc. v. U.S. Dep't of State*, 875 F. Supp. 2d 37, 46-47 (D.D.C. 2012) (finding that emails, which contained names, titles, offices, and phone numbers, qualified as similar files). Even where the emails contain the names of individuals other than the authors and recipients, they nonetheless contain personally identifying information and are therefore similar files. *See Judicial Watch*, 875 F. Supp. 2d at 46 ("[F]iles containing private information on

multiple individuals may also be protected." (citing *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir. 2006)).

The other documents—proposed talking points, draft opening statements, and draft rollout schedules—are also similar files. As explained above, the Supreme Court has made clear that any government record that can be identified as applying to the individual in question meets the threshold requirement under Exemption 6. In light of this broad reading of the term "similar files," as well as the fact that these documents contained the names of agency officials, the Court finds that the gatekeeping requirement is satisfied.

### b. Balancing of Interests

Having concluded that the withheld information is contained in files that qualify for exemption under Exemption 6, the Court must determine whether disclosure of the personal information would result in a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 522(b)(6). In making this determination, the Court must balance the privacy concerns of the agency officials with the public's interest in disclosure. *Wood*, 432 F.3d at 87. However, "[t]he balancing analysis for FOIA Exemption 6 requires that [courts] first determine whether disclosure of the files would compromise a substantial, as opposed to a *de minimis*, privacy interest, because if no substantial privacy interest is implicated FOIA demands disclosure." *Cook*, 758 F.3d at 176 (quoting *Long v. Office of Personnel Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012)).

An individual's privacy concerns "encompass[ ] all interests involving 'the individual's control of information concerning his or her person.'" *Wood*, 432 F.3d at 88 (quoting *Hopkins*, 929 F.2d at 87). "Information protected under Exemption 6 includes such items as a person's name, address, place of birth, employment history, and telephone number." *Lewis v. U.S. Dep't of Justice*, 867 F. Supp. 2d 1, 17 (D.D.C. 2011); *see Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989); *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 106 (D.D.C.

2010) (personal email addresses); *Schwaner v. Dep't of the Army*, 696 F. Supp. 2d 77, 82 (D.D.C. 2010) (names, ranks, companies, and addresses of Army personnel).

Where an agency has demonstrated a privacy interest sufficient to implicate Exemption 6, the burden falls to the requester to establish that disclosure "would serve a public interest cognizable under FOIA." *Associated Press*, 549 F.3d at 66. The public's interest in disclosure involves considerations of "the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Wood*, 432 F.3d at 88 (quoting *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997)).

### i. Identities of Background Briefers

The State Department's submissions do not establish a substantial privacy interest subject to balancing against any public interest in disclosure. As the State Department explains, background briefers are senior officials who are typically experts in the policy or subject matter that they brief. Stein Supp. Decl. ¶ 12. They hold positions that do not include, as a general job responsibility, interaction with the press. *Id.* The State Department asserts that disclosure of the identities of the background briefers would "harm [the briefers'] privacy interest[s] in conducting official duties free from harassment or embarrassment, by jeopardizing professional relationships and compromising the briefer[s'] ability to perform effectively in [their] field of expertise." Stein Decl. ¶ 33. These assertions, however, do not establish that any interference with the officials' ability to perform their jobs also results in a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Although courts read Exemption 6 broadly, *Washington Post*, 456 U.S. at 601, the exemption "does not categorically exempt individuals' identities," *Judicial Watch*, 449 F.3d at 153. "Names and other identifying information do not always present a significant threat to an individual's privacy interest[,]" and the threat to privacy "depends on the consequences likely to ensue from disclosure." *Wood*, 432 F.3d at 88 (citing *Ray*, 502 U.S. at 177). The Second Circuit has upheld the redaction of

individuals' identities where public disclosure would expose those individuals to "embarrassment and harassment in the conduct of their official duties and personal affairs." *Halpern*, 181 F.3d at 296-97; *accord Wood*, 432 F.3d at 88. However, "an identifiable privacy interest in avoiding disclosures of information that could lead to annoyance or harassment . . . does not authorize a 'blanket exemption' for the names of all government employees in all records." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005) (citing *Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1338 (D.C. Cir. 1980), and *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980)). "To justify their Exemption 6 withholdings, the defendants must show that the threat to employees' privacy is real rather than speculative." *Id.* (citing *Dep't of the Airforce v. Rose*, 425 U.S. 352, 380 n.19 (1976)).

The State Department has not provided evidence of a "real" threat of harassment to the background briefers. Instead, the Stein Declaration relies on conclusory statements and a hypothetical situation to explain the potential invasion of privacy. *See* Stein Decl. ¶ 33. The link connecting the disclosure of these briefers' identities to the alleged harassment is missing. The State Department has not indicated that the background briefers at issue hold classified positions, or even sensitive positions. The briefers appear to hold positions that are known, or knowable, to the general public. Therefore, it is not apparent from the submissions how a foreign counterpart's knowledge that the briefer—holding an official position known to the counterpart—delivered what became a public message would expose that briefer to unwarranted harassment in either his or her official duties or personal life. It may be that whatever privacy interest the briefers have in controlling dissemination of their names is *de minimis* and does not trigger the need to balance that interest with the public interest in disclosure. *See Cook*, 758 F.3d at 176; *Fed. Labor Rel. Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992) (noting that "the competing interests at stake must be balanced" only "once a more than *de minimis* privacy interest is implicated). The Court

cannot conclude otherwise on this record.

Although the State Department's failure to establish a substantial privacy interest is dispositive, the Court addresses the competing interests at stake here. In arguing that disclosure is necessary to inform the public about what the government is "up to," Mr. Seife has identified two particular concerns that will be satisfied by disclosure. The first is the public concern with "[u]nderstanding the reasons for the government's increasing reliance on background briefings, as well as other mechanisms for controlling press coverage." Declaration of Charles Seife, ECF No. 31 ("Seife Decl.") ¶ 13. Mr. Seife affirms in his declaration, without identifying the source of his information, that the proportion of press briefings held on background increased from twenty percent in 2008 to nearly ninety percent in 2014, without any parallel rise in overall number of briefings. *Id.* ¶ 12. Mr. Seife claims that allowing briefers to remain anonymous gives them "license to lie" and insulates them from any skepticism that they may draw if their identities were known. *Id.* ¶ 9.

Second, in his reply brief, Mr. Seife explains that disclosure of the identities of the background briefers will "demonstrate that executive branch agencies are actively deceiving the public about a longstanding government practice: that the government is less than forthright about whom it gives anonymity to at background briefings and why." Pl.'s Reply at 12. This appears targeted at the State Department's averments in the Stein Declaration that the background briefers do not routinely interact with the press.

These concerns are precisely the type of public interest cognizable under FOIA. *See Long*, 692 F.3d at 193 ("The only public interest cognizable under FOIA is the public 'understanding of the operations or activities of the government.'" (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989))). Of course, "[t]he simple invocation of a legitimate public interest . . . cannot itself justify the release of personal information. Rather, a court must first

ascertain whether that interest would be served by disclosure." *Hopkins*, 929 F.2d at 88. "Disclosure of information 'that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct' does not serve the policies underlying FOIA." *Massey v. Fed. Bureau of Investigations*, 3 F.3d 620, 625 (2d Cir. 1993) (quoting *Reporters Comm.*, 489 U.S. at 773), *abrogated on other grounds*, *Milner v. Dep't of Navy*, 562 U.S. 562 (2011).

With respect to the first public interest articulated by Mr. Seife, disclosure of the names of the background briefers would not reveal the reasons for the incremental number of press briefings held on background rather than on the record. Disclosure may permit Mr. Seife, and other members of the public, to contact the background briefers and attempt to obtain explanatory information from them. However, this attenuated relationship between the information sought and the potential illumination of the government activity at issue has been rejected by the Second Circuit as grounds for disclosure under FOIA. *See Hopkins*, 929 F.2d at 88 (finding disclosure of payroll records not required where it "would serve the public interest only insofar as it would allow the [plaintiff] to contact individual employees, who may then dispute the accuracy of the data reflected in the [agency's] records"); *see also id.* ("[W]e find that disclosure of information affecting privacy interests is permissible only if the information reveals something *directly* about the character of a government agency or official."). Moreover, the Second Circuit has expressly rejected "the interest in identifying a federal employee by name in order to make contact or conduct interviews" as a proper public interest to be balanced against the employee's privacy concerns. *Long*, 692 F.3d at 194. Indeed, such a use of information obtained under FOIA "actually facilitates the invasion of the employee's personal privacy." *Id.*

With respect to the second public interest—the interest in knowing that the government is deceiving the public regarding the officials who are permitted to remain anonymous in giving background briefings—Mr. Seife has identified a stronger public interest. Disclosure of the

background briefers' identities would likely reveal what the government is "up to" when it describes, at least in its submissions to this Court, the nature of the work performed by the briefers. Stein avers that the background briefers do not regularly interact with the press, Stein Decl. ¶ 32, while Mr. Seife has affirmed that he has personal knowledge of approximately a dozen briefings for which the briefers' identities were leaked, and in each case, the briefer was an official spokesperson or was otherwise "well-acquainted with briefing the press," Supplemental Declaration of Charles Seife, ECF No. 39 ("Seife Supp. Decl.") ¶ 7. Despite the State Department's argument that Mr. Seife's allegations in this respect are nothing more than speculative, Mr. Seife has substantiated this assertion with specific examples outlined in his declaration. At least one of these enumerated briefings occurred in 2014, the year during which a majority of the background briefings listed in the 12996 request took place. *Id.* ¶ 16. Mr. Seife proceeds to list additional background briefers that he personally has unmasked. *Id.* ¶¶ 21-26. Those briefers addressed the press anonymously on dates between September 2012 and May 2014, again within the date range of the briefings identified in Mr. Seife's FOIA request. The unmasked briefers were all either agency spokespeople or otherwise frequently interacted with the press. *Id.* ¶¶ 22-27.

Mr. Seife attests that he has personal knowledge of these allegations of fact. *Id.* ¶ 1. The Court credits his attestation, as Mr. Seife affirms that he has more than twenty years of experience in the media industry and has been using FOIA to research information about "governmental media practices" since 1998. Seife Supp. Decl. ¶ 6. Among his research, Mr. Seife has investigated the executive branch's practice of holding press briefings on background rather than on the record. *Id.*

This evidence, submitted by sworn affidavit, suggests that the assertion in Stein's Declaration that the background briefers do not interact frequently with the press was not made in good faith, and raises questions regarding the presumption of good faith that the Court otherwise affords to the State Department submissions. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174-75

(2004) (holding that, under FOIA Exemption 7(C), a requester asserting a public interest in showing that agency officials acted improperly in the performance of duties may obtain disclosure of requested information by producing "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred" and noting that where the presumption of good faith applies to agency submissions, "clear evidence is usually required to displace it").  While the Court does not at this time reach an ultimate determination with respect to the presumptive good faith that is owed to the State Department in connection with the sworn testimony it has submitted regarding background briefers, the Court notes its concern.

### ii.  Identities of Lower-Level Department of Defense Employees

The State Department has also withheld the identities of certain DoD officials.  Stein's supplemental declaration establishes that the DoD's practice is to withhold any personally identifying information of its members who hold the military rank of Colonel or below, or are otherwise ranked on the General Schedule ("GS") at GS-15 or lower.  Stein Supp. Decl. ¶ 13.  An exception to this policy exists for officials who routinely interact with the press.  *Id.*  The DoD's rationale for this policy is that such employees could face annoyance or harassment in their private lives if their identities are disclosed.  *Id.*  Regarding the specific individuals whose identities have been obscured here, Stein affirms that they were all ranked Colonel or lower, or GS-15 or lower, did not routinely deal with the press, were involved in sensitive discussions related to the "contentious regions" of Afghanistan and Iraq, and were not decision makers.  *Id.*

The public interest identified by Mr. Seife here is the interest in knowing who, and what departments within the DoD, are involved in making decisions regarding background briefings so as to elucidate the reasons for the on background briefings.  Pl.'s Mem. at 21; Pl.'s Reply at 14.  However, that public interest is insufficient to tip the scale in favor of disclosure, the primary reason, once again, being the lack of a sufficient link between the information sought by Mr. Seife

45

and the government activity at issue. Given the lack of a direct link, the public interest in disclosure is minimal, if it exists at all. *See Hopkins*, 929 F.2d at 88; *Ctr. for Public Integrity v. U.S. Office of Personnel Mgmt.*, No. 04-1274 (GK), 2006 WL 3498089, at \*4-6 (D.D.C. Dec. 4, 2006) (finding a minimal, if any, public interest in officials' names where the link between those names and the public interest allegedly served by disclosure was too attenuated).

Even if there were public interest in disclosure, the privacy interests at play here are sufficient to permit the redaction of the DoD officials' names. The Second Circuit, confronted with withholdings based on the same DoD policy at issue here, concluded that DoD employees "have a cognizable privacy interest in keeping their names from being disclosed wholesale" and found that interest to outweigh the minimal public interest in disclosure. *Long*, 692 F.3d at 192, 195. Other courts have similarly found the privacy interests of those officials whose names are withheld pursuant to the DoD's policy to outweigh the public interest in disclosure. *See, e.g., Carmody & Torrance v. Def. Contract Mgmt. Agency*, No. 3:11-cv-1738 (JCH), 2014 WL 1050908, at \*12-13 (D. Conn. Mar. 13, 2014) (finding that the public interest served by disclosing DoD employee names was "negligible or nonexistent"); *Ctr. for Public Integrity*, 2006 WL 3498089, at \*6 ("[B]ecause the privacy interest of the federal employees at issue in this case in the nondisclosure of their names and duty stations outweighs the minimal FOIA-related public interest in disclosure, the Court concludes that disclosure would constitute a 'clearly unwarranted invasion of personal privacy.'" (quoting 5 U.S.C. § 552(b)(6))).

In light of the minimal public interest in disclosure, and the privacy interest held by the DoD officials in controlling the dissemination of their names, the State Department's withholdings were appropriate to avoid a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Summary judgment is therefore granted in favor of the State Department on these redactions.

### iii. Email Addresses and Phone Numbers

The State Department has redacted the official government email addresses and official and personal cellular phone numbers of certain employees in sensitive positions within the State Department, the DoD, and the National Security Council. Mr. Seife asserts that the public interest at stake as to this information involves his need as a journalist to interview these officials, as well as a growing concern that senior officials attempt to evade FOIA by using private email servers in lieu of official ones. Pl.'s Mem. at 21-22.

The first of these public interests is non-cognizable under FOIA. *See Long*, 692 F.3d at 193 ("The only public interest cognizable under FOIA is the public 'understanding of the operations or activities of the government.'" (quoting *Reporters Comm.*, 489 U.S. at 775)); *Cook*, 758 F.3d at 177 ("Goals other than opening agency action to public scrutiny are deemed unfit to be accommodated under FOIA when they clash with privacy rights." (citation omitted)).

As to the second interest, Stein affirms that the withheld email addresses are those of DoD employees, National Security Council officials, and a State Department official.[11] Stein Supp. Decl. ¶ 14. These officials hold sensitive positions, and they maintain a privacy interest in their contact information. *See Lewis*, 867 F. Supp. 2d at 17 (noting that privacy interest exists in information such as a person's name, address, place of birth, employment history, and telephone number); *Gov't Accountability Project*, 699 F. Supp. 2d at 106 (personal email addresses); *Schwaner*, 696 F. Supp. 2d at 82 (names and addresses). The State Department has established that the email addresses that were withheld were exclusively official government email addresses, and not personal accounts. *See* Stein Supp. Decl. ¶ 14. Therefore, in weighing even a *de minimis* privacy right in the email addresses with the public interest articulated by Mr. Seife, the Court finds that disclosure of the redacted email

---

[11] The State Department has also withheld the contact information of an Office of the Director of National Intelligence official. That official's identity was withheld under FOIA Exemption 3, and Mr. Seife does not contest that withholding. Stein Supp. Decl. ¶ 12 n.8.

domain information would not be proper.  Accordingly, summary judgment on this issue is granted in favor of the State Department.

### C. Segregability

FOIA mandates that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes."  *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 626 (1982); *accord Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.").

With respect to the document in Category 15, the State Department has indicated that it "conducted thorough review of the document and determined that there is no meaningful, non-exempt information that may be reasonably segregated and released."  Stein Supp. Decl., Ex. 19 at 14.  As explained below, the Court will grant the State Department an opportunity to substantiate its claim of deliberative process privilege over the document and is not yet in a position to reach the question of segregability.

### D. Revised *Vaughn* Submissions

"[A] district court should not undertake *in camera* review of withheld documents as a substitute for requiring an agency's explanation of its claimed exemptions in accordance with *Vaughn*."  *Spirko v. U.S. Postal Service*, 147 F.3d 992, 997 (D.C. Cir. 1998).  Rather, "[t]he district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions."  *Id.* (citation and internal quotation marks omitted).  "If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the

agency's claims of exemption, the district court then has several options, including inspecting the documents *in camera*, requesting further affidavits, or allowing the plaintiff discovery." *Id.*

The Court finds it appropriate, at this juncture, to provide the State Department with the opportunity to either conduct a search for documents responsive to the 12997 request or to provide further substantiation for the agency's claim that such a search would be unreasonably burdensome. The Court also finds it appropriate to allow the State Department to provide further substantiation of the grounds for its withholdings with respect to the information and document claimed exempt under FOIA Exemption 5 and with respect to the identities of background briefers. *Cf. Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 174-75 (D.D.C. 2011) ("Having found the DOJ's *Vaughn* submissions inadequate, the Court has several options regarding how to proceed in this case . . . [T]he Court finds that the best approach is to direct the agency to revise their *Vaughn* submissions, taking into account the deficiencies identified by the Court."). The Court will defer ruling on the applicability of the deliberative process privilege and the presidential communications privilege to the redacted information and withheld document, and will also withhold ruling on the applicability of Exemption 6 to the identities of the background briefers, in order to allow the State Department the opportunity to provide additional support for its claimed exemptions. The Court will, of course, rule on the applicability of the asserted privileges and exemptions in the event that the State Department is ultimately unsuccessful in carrying its burden of demonstrating the applicability of the privileges and exemptions that it has asserted. Mr. Seife is free to assert any objection to the State Department's response to the 12997 request and to renew his arguments that the information withheld in response to the 12996 request is not protected under Exemptions 5 and 6, in accordance with the schedule set forth below.

Accordingly, the State Department's motion for summary judgment as to the applicability of Exemption 6 is GRANTED as to the withholding of the identities of DoD officials and contact

information for agency officials, and DENIED WITHOUT PREJUDICE as to the propriety of the agency's response to the 12997 request, the withholding of information and the Category 15 document pursuant to Exemption 5, and as to the withholding under Exemption 6 of the identities of the background briefers.

## V.     CONCLUSION

For the reasons stated above, the State Department's motion for summary judgment is GRANTED IN PART and DENIED IN PART without prejudice.  Mr. Seife's cross-motion is DENIED.  The denial of the Mr. Seife's motion is without prejudice to the extent that the motion challenges the State Department's response to the 12997 request, the withholding of documents and information under Exemption 5, and the withholding of the identities of the background briefers under Exemption 6.  The State Department is directed to submit revised *Vaughn* submissions addressing the State Department's response to the 12997 request, the information and document claimed exempt under Exemption 5, the identities of background briefers claimed exempt under Exemption 6, as well as a segregability analysis addressing the Category 15 document, along with a renewed motion for partial summary judgment no later than April 30, 2018.  Mr. Seife may file a renewed cross-motion for summary judgment with respect to the State Department's response to the 12997 request and its withholding of information and documents under Exemptions 5 and 6 no later than thirty (30) days from the date of service of the State Department's renewed motion.  Any oppositions to the motion(s) for summary judgment are due no later than twenty-one (21) days following service of the motions, and any replies are due no later than fourteen (14) days following service of the oppositions.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 27 and 30.

SO ORDERED.

Dated: March 24, 2018
      New York, New York

_____
GREGORY H. WOODS
United States District Judge